Okay, we are here today in the first division of the First District Appellate Court of Illinois to hear oral arguments in the case of Amy Taylor v. Brooklyn Boulders and Chicago Climbing Gym Company, case number 1-23-1912. My name is Terry Levin and I will be presiding along with my colleagues today, Justice Aurelia Paczynski and Justice Cynthia Cobbs. The way we like to do it here in the first division is you get like 15 to 20 minutes. The first 10 minutes of each of your arguments, we will try not to interrupt you and just let you get your arguments out and we would ask that the appellant save some time for rebuttal. So with that being said, I don't know if I gave the case number 1-23-1912 and we shall proceed. Let's hear from the appellant. Mitchell Bill Good afternoon, may it please the court. My name is Mitchell Bill and along with Patrick Murphy, I represent Amy Taylor. While participating in an activity heavily regulated by the state of Illinois, Amy was severely injured. She climbed high up on the defendant's climbing wall and was left stranded with no safe means of descent. The circuit court rejected her claims and granted judgment against her because of a purported waiver of liability. But when Amy signed that waiver, she was not informed that the defendants were required by Illinois law to have at least $1 million in liability insurance for the specific purpose of protecting users of their facility such as Amy. Amy also had no way of knowing that the belayer system utilized while top rope climbing demonstrated a special relationship on its descent under Illinois law that invalidates waivers such as the one that Amy signed. Instead of benefiting from the clear protections offered to her by the state of Illinois and the safety laws passed by the Illinois legislature, Amy has been left without recourse for serious injuries for nearly a decade. Under the Amusement Ride and Attraction Safety Act and Illinois law governing common carriers, the circuit court's grant of summary judgment cannot stand. This appeal raises two issues of law, either of which are independent grounds for reversal and remand. Should this court find that circuit court erred with respect to either of those arguments, a jury trial on remand would be necessary in light of the factual disputes also at issue in this appeal. The first argument raised in our brief is with respect to the liability insurance requirement in the safety act. Now this act is clear that it's for the protection of the patrons of facilities such as the trampoline courts and other amusement rides and attractions such as roller coasters, but here it applied to a rock climbing wall. When Amy signed the waiver, nowhere in that waiver did it say that the safety act was even applicable. She was not aware that there was a particular insurance requirement that they had to have at least a million dollars in coverage in case of injuries to her or any of her other patrons such as her friend who was with her on the day of her injuries. But what the waiver did say on page 297 of the record and also found elsewhere is that the laws of the state of Illinois govern the interpretation of the contract, the rights of the parties, and also the enforceability of the waiver. Amy therefore had every reason to believe that this waiver would be enforced only insofar as it is consistent with Illinois public policy. The policy set by the safety act could not be clearer. The safety of patrons who utilize these facilities. One of the ways in which the legislature chose to shift the burden of paying for injuries is by forcing facilities such as the defendants to have at least one million dollars in insurance coverage. That million dollars in insurance coverage was designed, especially as we put in was designed by the sponsors of the bill to ensure that people who are injured, including Amy, to have some sort of recourse for pain and suffering and for injuries that result because of the use of these facilities. When this safety act was passed, it did not need to have any sort of magic words. The defendant's briefs make it seem as though in order to find that an exculpatory clause or exculpatory contract to be invalid, there needs to be something in the statute that specifically states no exculpatory agreements are allowed. But that's not required. There's no magic words. The chef versus homestretch case is an example. There's no magic words that are required. All that's required is for there to be a settled public policy in the state of Illinois that is violated or that's inconsistent with the exculpatory agreement. That's what we have here. The magic words were not used. There are none. But what was stated in this in the safety act is that nobody, no person, no entity shall operate an amusement ride or an without this policy being in force. The meaning of in force, as this court is well aware, you look to what the plain meaning of what the statute says. The plain meaning of the word in force as we set forth in our brief is that it's got to be enforceable. It's got to be existing and it has to be effective. When Amy was participating in February of 2016, there was no insurance coverage in force. They caused her to sign a waiver and with respect to Amy and all of her other fellow patrons, since everybody's required to sign this waiver, no insurance coverage was in force for any of them. That's a huge problem under the safety act. While the safety act says no specific language, express language prohibiting exculpatory clauses, it says everything else. That nobody shall operate an amusement attraction or ride without this being in force. What that also says is that this isn't just a passive administrative requirement. It's not as though the defendants get the permit and they're free to go and they don't have to worry about the insurance policy. At every step of the way, every single time they open their doors to the public, every single time someone uses their facilities, it's required for that policy to be in force at that time. That's not what happened with Amy. And because that's not what happened with Amy, it's inconsistent with the public policy set forth by the Illinois legislature. The Illinois legislature has been consistent for decades that some sort of insurance requirement is necessary. And even recently they increased the amount to be consistent with what insurance policies typically are writing nowadays, which is a million dollars. There's not even an insurance policy available under a million dollars. So the legislature increased that requirement to be consistent with what the minimum standards are in the industry. That million dollars, at least a million dollars, was required to be available for Amy. Now to be clear, as we put forth in the brief, the safety act does not mandate insurance above a million dollars. If the defendants want to avoid liability, they can avoid liability in their waiver by causing somebody to waive liability above a million dollars. But that's not what happened with Amy's waiver. Amy's waiver was a blanket waiver of liability. And it begs the question, under what circumstances would insurance be available for Amy or for anybody else? If everybody's required to sign this waiver, then it seems to me that none of these insurance policies are being paid out. Now the examples that the defendants have offered are for the general public who's otherwise not required to sign the waiver. But the only people that are targeted by the safety act are the patrons of the facility. If a maintenance worker or some other employee from another facility attends this facility to do repairs or to sweep something on the floor and they get injured, that's not the purpose of the safety act. That's not the issue we have on appeal. The issue here is whether Amy, as a patron of the facility, was required to have a million dollars or more available to her, if it can be proved that the defendants are responsible. The defendants also point out that minors are exempted from liability insurance, from waivers of liability, and that the insurance department applies to that. But that's an aspect of public policy that the state of Illinois courts have decided is important to waive, that's not allowed to waive liability. That aspect of public policy was enough to rule that exculpatory clauses are not enforceable. It leaves open the door that other aspects of public policy, if they're violated, such as here, waivers of liability are ineffective. One of the aspects that is set forth in our brief that I'll touch on very briefly is the Dawkins case. The Dawkins case admittedly is a very different factual scenario. But what this court and all of the reviewing courts in Illinois take a keen eye towards is rendering some sort of absurd result that's against the manifest welfare of the state. The public policy of the state is the welfare of the state, making sure that everybody who is subject to the laws of the state is afforded the protections of the state and abides by the laws of the state. If this court and other courts render absurd results, there is an obligation to refrain from making those sorts of rulings. The Dawkins case was an example where there's a requirement to have an AED available. People are trained to use it, but there's no express requirement to actually use it. The Illinois Supreme Court found that there's an additional implied obligation that if there's a requirement to have it, there's a requirement to train for it, then there's a requirement to use it. That's the argument we're raising here. There's an obligation for the defendants to have a million dollars of coverage. Therefore, it's against the state of Illinois' policy for them to privately contract away from that, certainly without informing the patients of their right to that policy, assuming liability can be proved. Another aspect of the defendant's brief that I want to point out on this, on the issue of liability insurance, is they've asserted a number of other statutes where there is an express prohibition on exculpatory agreements. The Landlord-Tenant Act, Animal Control Act, the Home Vacation Act, in one sense, none of those acts have any sort of insurance requirements. On that fact alone, the statutory schemes cited there are irrelevant. Moreover, they're not safety statutes. They're not comprehensive safety statutes that have heavily regulated activities where the Department of Labor has permit requirements, has the ability to revoke a permit if there's a violation. It's a comprehensive safety statute designed for patrons of facilities like Amy. But Amy was not allowed to be subject to those benefits. In an effort to... Yeah, the common carrier issue. Yes. So, with respect to the common carrier issue, understanding that there's a difference, there's an inherent difference between the activity of Amy climbing the wall and Amy descending from the wall. We've left in place the Circuit Court's ruling as to summary judgment on the issue of her going up the wall. There, she is in total control. We've left that ruling in place. But on the way down, it's the primary means of her descending by letting go and letting the belay system take effect. Did you raise that issue below? Yes. The reason we raised it below is we've narrowed the argument on appeal. Understanding we're not allowed to expand our arguments, to raise entirely new arguments. Our argument in the Circuit Court was that the entire system from start to finish, from when Amy starts her ascent until she arrives back down, that was our argument in the Circuit Court. Understanding what the Circuit Court's ruling was on ascent, we're leaving that in place. And we're focusing only on the second half of what was raised in the Circuit Court. So, that issue was not raised. Additionally, the comparison that I want to make, and understanding I'm approaching 10 minutes if I haven't hit it already, is an elevator operator where there's an actual person there. Just because there's a person involved in the scenario, such as the partner of Amy, doesn't take it outside the realm of a common carrier. It's a mechanized device that has the assistance of a human, but the assistance of the human is not Amy herself. She's allowed to let go and let the belay system go down. The problem is Amy had no system available to her when she reached her peak. And the rule under common carriers is that if it is a common carrier, the obligation is for Amy to descend safely until she reaches a place of safety. And at that moment, the high-risk duty of care ends. When Amy's at her peak, she's entitled to rely on the defendants exclusively to provide a system that allows her to descend safely. But that didn't happen. Any questions for my colleagues? I do have a question. Go ahead, Justice Kuczynski. I thought I read in this record that Amy used her own equipment, did not use the company's belay equipment, and had her own spotter. Which of those statements do you not agree with? She used her own harness, my understanding. But the actual system, the mechanized device, is the rope going all the way to the roof, to the ceiling, and going through the anchor that's in the control of the defense facility. But she used her own belay system, not the company's. Is that a correct statement? My understanding is that the harness was hers, but the rope that went through the belay system was the facility's. But didn't she, for lack of a better word, connect it up herself? Yes. Okay. So it's not like somebody from the company said, here, let me make sure this belay system is working right. She just said, I'll do it, and did it herself. Well, so the second part is correct. Our complaint alleges that there was an obligation for the defense employees to ensure that everything was appropriately secured. So you're saying that after she did it herself, they should have double checked it. Yes. That's one of our allegations in the complaint. And you're also saying they did not do that? Correct. Okay. What if they tried to do that and she said, don't bother, I got it? Well, certainly that'd be a different scenario. But I still think there's other aspects of our complaint that allege negligence, such as once she's at her peak, she has an obligation to get back safely. There were no crash pads on the bottom. How is that going to be possible if she used her own equipment and attached or connected the belaying system herself? So she had an obligation to tie the rope on her harness that's connected to her body. But the rope that goes all the way to the ceiling and then goes back down to her partner, that's what happens. So even though she had a role initially, it's more akin to her entering the common carrier. So if she's entering the elevator, she obviously has a role to walk into the elevator. But once she's in the elevator, there's an obligation for the owner of the elevator to protect her. That's the scenario we have here. She hooked herself up. But from that moment forward, she was going up the wall. And once she got to her peak on the wall, it was the defendant's obligation as a common carrier of the belay system that was connected to their facility to make sure that she reached the ground safely. Okay, but she hooked herself up to the belay system. That's correct. Thank you. Well, in most, probably in all common carrier scenarios, there is this huge issue of control. It's the individual who is utilizing, say, the elevator or the train. They have no control, which is seemingly the single most important factor in defining common carrier. How do we or how do you address or how do you reconcile that issue of control in this scenario when Amy, and forgive me for using her first name, when Amy actually has taken control of connecting her own self to the harness, having her own spider, those kinds of things? I'm not sure I understand the control issue here. Sure. So the control that's in the possession of the defendants is the system as a whole, how the whole system works together. So sure, she hooks herself up. She attaches herself to the wall and understanding that the circuit court found that that was not a common carrier. But the nature of the device changes when she's coming down. One of the things that I want to clarify is in the defendant's brief, they noted and cited testimony in the record that on descent, the primary method of coming down the wall is down climbing, which is essentially her climbing downwards. But that testimony was with respect to bouldering, which has no belay system at all. So when Amy gets to the top of where she wants to climb, she lets go. And the system, which is in the control of not her, it's in the control of the defendants, is to make sure that she gets down safely. Now, of course, there is a human aspect on the ground. Her partner is there to help release slack on the rope. But it's the pulley system and the harness system that's utilized by the defendants to ensure that the defendants have that system operating appropriately to monitor and make sure that the partner is actually bringing her down safely. There's an obligation of control where this system as a whole, not in its individual parts, as a whole, there's an obligation to make sure that she slowly descends to safety. But that's not what happened here. So Amy has no... Can I just, I want to make sure I'm clear, because you are parsing out, or at least you're compartmentalizing when an entity becomes a common carrier. Now, my understanding is that it wasn't necessarily that she was descending. Upon her ascent, the individuals on the ground said to her, your harness is not connected. She fell. She wasn't descending. She fell. To say that she's descending suggests to me that she was, at that point, making a decision that rock climbing for me is over for the day. I'm ready to descend. I thought that what was occurring was as she was ascending, the folks on the ground noticed that the harness that she had attached was not properly attached. And within moments of recognizing that came the fall. Not that she had, even if accepting that we could compartmentalize when an entity becomes a common carrier, it wasn't in my reading of the record that she had completed her climbing for the day and had determined that at that point she was ready to descend. But instead, she was falling. So, I agree with your interpretation of the record on that. What I will say is, in terms of the common carrier analysis, because it's not an all or nothing approach, it can be compartmentalized whenever the descent is supposed to start. It could be when she actually intends to, or it could be earlier than that, such as what happened here, when she's ascending and she learns that she's no longer attached. Whatever the moment in time is that she stops and she wants to come down, that's when the common carrier starts. That's when the nature of the common carrier begins. And so, for her, the fact that she was staying stagnant when she learned that she wasn't no longer attached tells me that she was ready to come down. And it's at that moment that the common carrier's obligations begin and the highest duty of care begins. Was she ready to come down or was she ready to attempt to attach the harness properly? I don't know that I read anything in the record that indicated she was ready to come down, as much as I perceive that noticing the harness was not properly attached, she was attempting to secure herself. So, I will say there isn't any specific evidence in the record that at the moment she stayed stagnant, she was, in fact, ready to come down. But there's circumstantial evidence of that. She was not ready to keep going either. And so, she wanted to come down. And the fact that she held on for about 30 seconds and then fell tells me that she wouldn't have lasted much longer anyway. But the point that matters for the common carrier is that at whatever moment in time the patron is descending, whether they wanted to descend at that time or not, the descent needs to be a controlled descent. And that's what's required by the common carrier standard of care. It sounds like an uncommon carrier to me. I mean, to compare this to, you know, getting on the L, getting on an escalator, getting on an elevator, you know, it just seems like a stretch. But the conduct of your client in securing herself, obviously, there's a substantial question as to whether or not the accident was as a result of that. Would you agree? I certainly think, yes. I certainly think that whether she is in some way responsible is a jury issue. But in terms of the duty analysis, it's a question of law as to whether ordinarily on descent for a belay system like this one, whether that falls under the definition of a common carrier. So, whether she is in any way at fault for attaching herself improperly is a question of fact that a jury decides. And it certainly would play a role in apportioning fault, whatever that might be. Even if it's 100% fault, that's a jury's right to make that ruling. To make that determination. And with respect to your Honor's comment that it's, it seems like an uncommon carrier, I'll admit this is not a, this is not a clear cut scenario where we have someone alighting onto a CDTA bus. But we do have a scenario where the belay system as a whole is in control of the defendants. They have an obligation to monitor it. They have an obligation to provide rope that is sufficient. They have an obligation to make sure that everything is attached appropriately in order to descend slowly and safely. And so, even private entities are allowed to be common carriers. An elevator that's owned by a private corporation is a common carrier, even though it's a- It's still an elevator though. It's not the common carrier. It's not the, it's not the corporate entity. It's the elevator. It's the instrumentality, not the individual. That's right. And that's also- Or the corporate entity. The real common carrier here is not the entire operations of the defendant's facilities. It's the specific transportation from top to bottom of the wall. And that's what we've limited it to. That's what the common carrier purpose really is, is that the plaintiff is no longer in control. She's seated in control and comes down safely. That's the purpose of a common carrier. But that didn't happen for any. Okay. Any other questions? Or let's hear from your opponent here. Mr. Cray, is that how you pronounce your name? Eppley? Yes, Your Honor. But Mr. Sandals will be going first for the Eppley's, if that's all right. Okay, sure. Not a problem. I forgot we had two. I'm often forgotten. May it please the court. Good afternoon. My name is Michael Sanders and I represent Brooklyn Boulders LLC. The judgment should be affirmed. The exculpatory agreement that plaintiff voluntarily signed is consistent with public policy and should be enforced. Now, it's consistent with public policy for two reasons. One, it is not prohibited by the Eppley's. And second, we defendants are not common carriers. I'll handle the first point. Mr. Cray will handle the common carrier point. Now, Brooklyn Boulders does have another argument that the circuit court did not reach, which is that Brooklyn Boulders did not own, operate, or control the facility in Chicago where this accident occurred. Chicago Climbing did. But we're going to stand on our brief on that point. But I'm happy to answer any questions that the court may have. But turning to our first point, the judgment should be affirmed because the exculpatory agreement is not prohibited by the Amusement Right Act. The General Assembly, when it passed the act, has chosen to regulate this industry, but it chose not to include any language that prohibited exculpatory agreements. Our Supreme Court in Harris, this court in Cox, this court in Owen, all found that when the legislature decides to regulate an industry, that does not render an exculpatory agreement against public policy. And in each of those cases, the court enforced the agreement as written. In addition, in Harris, in Cox, Zergel, for example, the court found that when the General Assembly has chosen to regulate an industry and chosen not to include any language that prohibits exculpatory agreements, the court takes that as a sign that the legislature has decided that those agreements are consistent with public policy. Our Supreme Court in Harris said, we note that the legislature has dealt with liability for injuries caused by animals in the Animal Control Act, and they did not choose to preclude the use of exculpatory contracts. In Zergel, the court said, since the legislature had the opportunity to prohibit or limit exculpatory clauses in home inspection contracts, but did not, we declined to do so here. And this court should do the same thing. The General Assembly passed the Amusement Right Act to regulate this industry. And in that act, it set up a safety board. It empowered the safety board to issue rules regarding the safe operation and inspection of rides. It created an enforcement process for violations. It created a permitting process. It committed an inspection process. And it did set this insurance limit, but it did not include any provision that prohibited or limited exculpatory agreements. And in fact, as counsel pointed out, it amended the statute several times. It amended it in 2014, in 2023, after Zergel, after Harris, after Cox, and it made several changes, but it did not prohibit exculpatory agreements. And the legislature knows how to do it. It does prohibit them in residential leases, but it chose to regulate this industry and chose not to prohibit exculpatory agreements. And the Illinois courts have long held that they will not read into a and this statute shows that the exculpatory agreements are not prohibited by public policy. Also, the court in Harris, this court in Cox, all find that the public policy strongly favors the freedom of contracts and allows parties to assess risk as they see fit. And that's what the parties did here. The plaintiff testified under the deposition that she read it. She understood it. She did not ask any questions. There's been no testimony regarding that she had questions about it, that it was ambiguous. There's been no argument about what that agreement says or that the terms were insufficient, but she read, she testified that she read it. She understood it. She had the right to reject it, but she went ahead and assigned it. There's been no argument in all these years that it was ambiguous. It was insufficient that it did not apply to us or apply to the incident at issue. And remember at the time of the accident, she had been trained. She had used the facility for about three months. I think she testified. She'd gone about a dozen times and gone up and down at least one to six times every time. And yet she's chose to continue coming. She obviously did not believe that this was a risk she was not willing to undertake. Now, the fact that the Amusement Right Act contains an insurance requirement, that doesn't change this analysis. The case is not about insurance. This case is about exculpatory agreement. And there's nothing in the language requiring insurance that prohibits exculpatory agreements or limits them. There's been no argument that either defendant did not have a policy of insurance in force at the time of the accident. There's been no argument that Chicago Climbing did not have a policy in force at this facility. Now, Plaintiff does talk about the Dawkins case, but it does not apply. The Dawkins case, of course, did not involve a different statute. It did not involve exculpatory agreements. But the court in Dawkins interpreted the express language of the statute, and it did not do what the Plaintiff is asking be done here. The Dawkins court found that the Plaintiff's lawsuit alleging willful and wanton conduct was allowed. And the reason it was, is because the language in that statute that prohibited lawsuits expressly excluded willful and wanton conduct. So, of course, it would be absurd not to allow the lawsuit for willful and wanton conduct to go forward when the statute expressly allows it. But the court did not do what the court did not add language to the statute. Nor did the court, in the guise of interpretation, take language discussing one topic, insurance, for example, and expand it and apply it to a different topic. And it's not absurd or inconsistent for the legislature to require insurance, but allow exculpatory contracts. In fact, that's a choice that the legislature can make and has made. The fact that Ms. Taylor, in this case, may not be able to pursue a negligence action does not impact the fact we had insurance. Chicago Climbing had insurance. The fact that she signed something that she testified, she read, she understood, she knew she could say no, rejected, that doesn't impact the fact that we had insurance in force at the time of the accident that would pay for judgments or settlements covered by the policy that were entered against us. It would apply, for example, to allegations of willful and wanton conduct, which were never made here. It would apply to minors, which are inapplicable. It would apply to people who refused to execute the agreement. And under a broader policy, it would apply to facilities that don't require exculpatory agreements or where they're not available or not possible to execute. Here, the plaintiff could have chosen not to execute this agreement, but she did. She read it. She understood it. She knew she could reject it, but she signed it. She could have gone someplace else. She could have stopped going if she thought the risk was too high. But the courts honor the freedom of contract. The courts honor the choice of the legislature to decide whether or not to And in this instance, the legislature has. The plaintiff understood it. She knowingly executed it, and the circuit court properly enforced it as written. So the reasons stated today and the reasons stated in our brief, we'd ask the court to affirm the judgment. I'm happy to answer any questions, but if there are questions, Mr. Cray will take the common carrier. Any questions, my colleagues? You're a litany of things that she could have done. She couldn't use that equipment without signing this exculpatory agreement. Is that a correct statement? Right. She cannot use the facility. She's an adult, so she cannot use the facility without executing an exculpatory agreement. Our facility. She could use somebody else's, of course, but not ours. Okay. And then I just want to make certain that I understand because Mr. Michael S is not on. Mr. Build made a point to argue that the insurance policy was not in force. It existed, but it was not in force. And you make the point that it's applicable. Is that the distinction? We believe it's in force in the fact that it exists. There is the certificates of insurance for Brooklyn Boulders is in the record. So is the certificate of insurance for Chicago Climbing, but it's there. It would apply to any judgments or settlements against Brooklyn Boulders or Chicago Climbing. It simply doesn't. It applies. It's just that Miss Taylor chose to execute this exculpatory agreement, and so there may not be an action to go forward. She may not have an action, but the insurance is there. So it would apply in, say, a circumstance where there was an allegation of willful and wanton. Yes, Your Honor. Thank you. Mr. Cray. Thank you, Your Honor. May it please the Court. My name is Patrick Cray representing Chicago Climbing Gym Company, and the Supreme Court's determination that a top rope climbing gym is not a common carrier should be affirmed. Our Supreme Court in Tolman stated that users of common carriers are passengers and that their role in using common carriers, such as a bus or a train or an elevator, is a passive one, and common carrier passengers do not actively contribute to their own safety while using common carriers. The common carrier designation is appropriate only for operators who maintain sole control of the machinery or devices used in operation. In this case, Taylor cannot show the climbing gym exercised sole control of the devices she used while climbing on the occurrence date, nor was the climbing gym in the business of transporting individuals like Ms. Taylor. Now on appeal, Taylor has changed her argument regarding whether top rope climbing gyms are common carriers. She argued before the circuit court that the entire combination of devices used qualify top rope climbing as a common carrier, and she made no distinction between ascending up the wall or descending down the wall. But after the circuit court found that Taylor transported herself along the wall, that she and her partner used the equipment, and that the top rope climbing was not contemplated as the kind of traditional common carrier activity like a bus or a train, Taylor now changed her argument and says that it's a common carrier only during the descent. As Justice Lavin alluded to, we believe this was waived because at the circuit court level, the argument was the entire combination of systems was a common carrier device, and now the argument is, well, it's not on the way up, but only on the way down. But looking past the waiver argument, Taylor now agrees with the appellees on appeal that that combination of devices, at least on the way up, is not a common carrier activity. However, at the moment that Ms. Taylor decides that she wants to come down, that same combination of devices now transforms into a common carrier device. Unsurprisingly, this does not have any, you know, supportive legal authority behind that theory, and it's in conflict with common carrier case law because it overlooks the main element that Justice Cobbs referenced in this common carrier analysis, which is, does the operator maintain exclusive control over a passenger's movement and safety? Now, in this case, Taylor testified that she tied her own knot on a date of the occurrence. Her partner attached the rope to the belay system. Taylor admitted that if the rope had been tied properly, she would not have fallen, and she controlled her own movements along the top rope climbing course. These factors were within Taylor and her partner's exclusive control and not within the climbing gym's exclusive control. In Taylor's reply brief, and I believe her counsel mentioned today, she believes that her partner's involvement in the climbing is somehow supportive of the her partner both controlled aspects of their movement and safety. That necessarily means that the gym was not an exclusive control of the maintenance and safety, of her movement and safety. My apologies. So, this lack of operator control is what separates top rope climbing from other traditionally recognized common carriers, like a CTA bus or a train, and top rope climbing is not the kind of traditional activity recognized under the common carrier jurisprudence. An amusement operator example of a common carrier is a Ferris wheel, and the difference is between a passenger in a Ferris wheel who gets on the car and has no say or control in the movement of that device versus a participant in top rope climbing who controls all the movement along the climbing wall, and either the climber and in combination with a human partner, a human partner who also was experienced and has participated in this before, they are in control of their safety on this occasion, which is why it's in stark contrast to a Ferris wheel. Taylor's common carrier argument on appeal seems to be that once a climber decides that they want to come down, they invariably rely on the gym, they surrender all control to the gym to control the descent down to the floor, but that argument is clearly belied by the factual record in this case. Down climbing is where the climber, along with their belayer partner, in a similar path to how they climbed up, climbs down the path on the way down, and the belayer, human belayer, helps in that controlled descent down. A Brooklyn boulders employee testified that this was the primary way to come down off the wall, and while Mr. Bill referenced that that was in bouldering cases on the same deposition testimony page, Ms. Mavsky says that it applies to both kinds of and when down climbing, nothing changes about the system of devices that Ms. Taylor concedes is not a common carrier other than the direction the climber is traveling in, and the climber's decision to travel in that direction is also something within her control. So even if there were merit to Taylor's argument that down climbing somehow transformed this into a common carrier activity, the record reflects, to Ms., to Justice Cobb's point earlier, Taylor was ascending at the she learned that her harness and rope had become unattached. So during the point to where Ms. Taylor concedes that this was not a common carrier was one that occurred. Ms. Taylor stated in her reply and stated here today through her counsel that she had no safe means of descending down the wall on the occurrence, but that misrepresents the record because she and her partner controlled the belay system in the sense that she tied in her own knew how to tie it. Her partner knew how to check whether or not the belay system was properly in place. And according to Ms. Taylor's own deposition testimony, if she had properly tied her knot, she would not have fallen. And Taylor's counsel argues again today that that's an inappropriate analysis of fault and liability that's better reserved for a jury's determination, but all common carrier cases have had to determine whether or not there's an element of the movement or safety that's within the plaintiff's control. And that's the only purpose why it's relevant to this analysis here is because this was something that was not only within Taylor's control, but more importantly, not within the top rope climbing gym's control, which is dispositive of this issue of top rope climbing not being a common carrier. I just wanted to end by pointing to a couple of case law examples of decisions where other mechanized devices were not found to be common those are instances where you've mechanized devices where a plaintiff has even less control over their movements due to the mechanism than a top rope climber does because the top rope climber is controlling all aspects of their movement. And in those cases, the court determined that as long as a plaintiff has some control over the movement, that's the baseline, some control, it's not a common carrier. And I believe the record in this case is clear that Ms. Taylor did have control over her movement and safety along with her partner. And because they did, those were not elements of movement and safety within the gym's exclusive control. And that is why the top rope climbing gym was not a common carrier. And let's go to some questions. So that's, that's, we asked that the court affirmed so many judgments. The allegation here was negligence, not willful unwanted, correct? Correct, your honor. That's all I have. Anything else? Let's hear a rebuttal. Okay, let's hear a rebuttal. Five minutes. Thank you, your honors. I'll focus on the common carrier argument in my rebuttal. One of the things I want to point out is a common carrier has an obligation that if they're a common carrier, the obligation is to get them to a place of safety. The facts in the record here show that Amy was stranded at the top. If she could have down climbed, she would have. But that's not the ordinary course of events with top rope climbing. The ordinary course of events with top rope climbing, which is supported in the record, is that the climber controls their ascent. But once they're supposed to come down, whether they choose to come down or they're tired, at that moment in time, the common carrier takes over and they're allowed to rely on the system that's in place by the defendant. The fact that a human is there who's not necessarily that human on the bottom is not an employee of the facility, I believe doesn't answer the question. The system as a whole, the belayer system is managed and monitored by the defendants. If someone on the ground who is employee of the facility sees something happening that's not right with that system, they have an obligation to intervene. That's part of the allegations here. One of the allegations is that there was a failure to train employees to know what to do when a harness becomes detached. If someone's on a CTA bus and the bus all of a sudden loses control, there's an obligation for the driver of the bus and the owner of the bus to ensure there's some sort of backup plan to protect people on the bus when something goes wrong. That's part of the argument here with the common carrier issue, is that once it was learned that Amy was stranded at the top, everyone knew that she was in danger because she had no safe means of descent. It was not reasonable or practical for her to down climb on her own. That's not the purpose of top rope climbing. The ordinary course of events is that she's able to let go and go down slowly with the help of the system that's monitored and controlled by the defendants. That's why this is a common carrier. Because Amy was allowed to rely on this mechanized device that, of course, had some human assistance that was not her, she was allowed to rely on that to bring her down to some sort of safety and at least a reasonable opportunity of safety, but she was stranded. That's why this is a common carrier on the descent, understanding that it's not a classic scenario where there's a CTA bus or an elevator where it's entirely purely passive. Here, all that's required is that Amy's role be passive and that she seize control to the defendants. That's what she did. She had a reasonable expectation to rely on the defendants to provide her with a safe means of egress from this facility, from the mechanism that should have been attached to her. Because there was no mechanism to bring her down safely, the descent was not inconsistent with the highest duty of care owed by a common carrier. For those reasons and for all those other reasons in our brief and otherwise discussed today, we ask that the court reverse and remand for a jury trial. Okay, we will thank you for your briefs and argument today and we will take the matter under advisement and issue an opinion or order forthwith.